FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

DEC 09 2008

JAMES W. McCORMACK, CLERK
By: _____
DEP CLERK

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN  DISTRICT OF ARKANSAS**

| | |
|---|---|
| SHAWN MARTIN, ANGELA RUSS  and )<br>NITISHA INGRAM, Individually and On )<br>Behalf of All Others Similarly Situated, )<br> )<br>Plaintiffs, )<br> )<br>vs. )<br> )<br>APOLLO GROUP,  INC. and )<br>THE UNIVERSITY OF PHOENIX, )<br>INC., )<br> )<br>Defendants. )<br> )<br> ) | **COMPLAINT-CLASS ACTION**<br><br><br>**CASE NO.  4·08-CV-4199 SWW**<br><br><br><br>**JURY TRIAL DEMANDED**<br><br>This case assigned to District Judge _Wright_<br>and to Magistrate Judge_____ |

**PLAINTIFFS' ORIGINAL CLASS ACTION COMPLAINT**

## I.   INTRODUCTION

Plaintiffs, by and through their undersigned attorneys, hereby complain against Apollo

Group, Inc. ("Apollo") and The University of Phoenix,  Inc. ("UOP") (collectively referred to as

"Defendants"), on behalf of themselves and the proposed class of similarly-situated student loan

borrowers, upon information and belief, except as to their own actions, the investigation of their

counsel, and the facts that are a matter of public record, as follows:

1.      Plaintiffs and Class Members (as defined below) were former students of UOP

who qualified for and received federal student loans to pay for their education.[1]  Although each student withdrew from UOP within weeks of enrolling, they attended long enough to incur some amount of tuition related debt that UOP was entitled to debit from the students' federal loans. Although UOP was in possession of each student's federal loan money, rather than debiting the amount owed for tuition, UOP, without the knowledge or consent of the students and without standing to do so, returned the federal loan monies to the lenders and immediately thereafter sought to collect the outstanding amount directly from the students.

2.      UOP's act of returning federal loan money for educational services rendered is neither mandated nor warranted by applicable federal rules.  Indeed, the Higher Education Act ("HEA") policy requires the opposite – a borrower is entitled to the applicable percentage of loan funds earned prior to a student's withdrawal. 34 CFR §668.22(e)(2).  UOP's motivation behind this seemingly illogical and counterintuitive conduct, however, is clear.  Title IV loans have become the financial backbone of the private-for-profit education industry in which Defendants have a significant presence.  Participation in the federal loan program is highly coveted and, for most schools, essential for their financial viability.   Indeed, according to Apollo's Annual Report issued on Form 10-K, nearly 70% of their annual revenues are derived from federal loans.

3.      Recognizing that students and schools have become heavily dependent on the federal loan program, the government has set forth a number of requirements for schools to meet in order to remain eligible for Title IV funds – the most significant of which are threshold cohort

---

[1]Federal student loans refer to the family of student loans guaranteed by the United States and  authorized under Title IV of the Higher Education Act. They will be referred to throughout the complaint as "federal" or "Title IV" loans.

default rates. In sum, cohort default rates represent the percentage of a school's borrowers who enter repayment on federal loans during a given fiscal year and default. To remain eligible to participate in Title IV programs, educational institutions must maintain a student loan cohort default rate that does not exceed 25% for three consecutive years, or exceed 40% for any given year. Moreover, if a school's student loan default rate equals or exceeds 10%, the school must delay for 30 days the release of federal student loan proceeds for first time borrowers and permanently loses the ability to participate in the "school-as-lender" program, among other penalties.

4.     Statistics and logic suggest that borrowers who do not complete their program of study are significantly more likely to default than those who complete their course of study.[2] UOP's completion rate for undergraduate students working toward an associate or baccalaureate degree, who started between September 1, 2001 and August 31, 2002, was only 9.77%.[3]

5.     Not surprisingly, schools have employed a number of measures to minimize their cohort default rates. While legitimate means such as those designed to counsel and educate borrowers are highly encouraged by the government, any attempt to artificially deflate cohort default rates are strictly prohibited.

6.     UOP reported cohort defaults rates of 7.2%, 7.3% and 7.5% for fiscal years 2004, 2005 and 2006, respectively. Not only do UOP's default rates closely border the 10% threshold,

---

[2] *Student Loan Default Literature Review*, December 22, 2004, Robin McMillion. TG Research and Analytic Services.

[3] These statistics are mandated by the HEA and are UOP's most recent statistics as presented at http://www.phoenix.edu/about_us/consumer_information.aspx#student_completion_rate.

3

the vast majority of their students, having never completed their course of study, run a significant statistical risk of defaulting.

7.     By returning the students' federal loan money, even after the student incurred a charge, UOP effectively prevents such a student from ever being considered in the cohort default analysis.  Since students who do not finish their education are at the highest risk of defaulting on their loans, UOP's actions are a transparent attempt to manipulate their true cohort default rates in violation of the mandates of the HEA.

8.     By returning a student's loan money to the lender, UOP effectively pays off that student's loan, eliminating the student's contractual obligation with their lender.  Rather than eradicating the debt on their books, however, UOP then seeks to collect directly from the student the amount owed for tuition that it should have satisfied with federal loan money.

9.     In addition to the fact that UOP had no right to interfere with a contract between a student and a third party lender, UOP also does not have the right to seek a payment directly from a student who has chosen, with UOP's assistance, to pay for his/her education by using federal loans.  Doing so deprives students of the benefits of the terms on which they borrowed money (i.e. low interest and a six month grace period in which to start paying) and saddles them with an immediate debt and payment terms which were never acceded to by the student by contract or otherwise.  Unsuspecting students are routinely bombarded with calls, letter and e-mails from UOP to collect tuition along with threats that refusal to pay will result in referral to collection agencies and negative reports on their credit.

10.    UOP's actions have yielded millions of dollars in ill-gotten gains.

11.     Plaintiffs file this class action on behalf of themselves and all those UOP students who in the last four years received Title IV loans to pay for tuition expenses at UOP, whose Title IV loans were paid off improperly by UOP, as detailed below, subsequent to their withdrawal from the school; and who were then unilaterally made liable for such debt by UOP.

## II.    THE PARTIES

12.     Plaintiff Nitisha Ingram:

a.      Ms. Ingram is a resident of Pulaski County, Arkansas and attended the Little Rock campus of The University of Phoenix. Ms. Ingram enrolled and began classes for a Masters of Business Administration in or around January, 2007.

b.      Ms. Ingram applied, qualified and received federal loan monies to pay for her UOP education. Ms. Ingram contracted with a bank for approximately $9,000 to cover tuition related costs at UOP. At least some portion of her loan was authorized under the Title IV program. Ms. Ingram's Student Financial Aid Agreement designated federal financial aid as the primary finance option. Ms. Ingram did not have the cash, nor would she have attended UOP if she had to pay for it on a cash basis. Ms. Ingram, after attending classes for approximately three weeks, decided to withdraw from UOP. According to federal guidelines and UOP policy, UOP was entitled to a pro-rata share of tuition corresponding to the amount of time Ms. Ingram attended UOP. Such a sum was to be deducted from Ms. Ingram's federal loan monies that had been paid to UOP on behalf of Ms. Ingram. Instead of accepting this prorated payment and properly crediting the federal loan money toward Ms. Ingram's tuition, UOP, without Ms. Ingram's knowledge or consent, gave this portion of her federal loan back to the bank and now

5

seeks to collect the tuition directly from her.

        c.     Consistent with Ms. Ingram's enrollment documents, she provided payment to UOP in the form of a Title IV loan and satisfied her contractual obligation to pay UOP for the time she attended.  By paying off her loan debt, UOP extinguished the debt for its own purposes.  UOP's subsequent effort to collect on the amount which UOP chose to pay off is not based on any contract, nor does it reflect any obligation that Ms. Ingram has undertaken vis-a-vis UOP.

        d.     UOP had no right to interfere with the contract between Ms. Ingram and her lender. That UOP chose to extinguish the loan debt, does not give them the right to collect it directly from Ms. Ingram . This not only imposes a requirement where none has been contracted, it is an illegal attempt to convert a Title IV loan owed to a third party lender, with certain rights privileges and obligations into a new and different debt owed directly to the school.

        e.     UOP unilaterally  paid off her Title IV loan -  deliberately giving the lender the portion it was entitled to keep.  UOP now seeks the amount it returned - $5354.00 - directly from Ms. Ingram.  UOP provided Ms. Ingram the following alternatives: (a) to re-enroll in classes in order to recover her financial aid; (b) to apply for private, high interest loans to replace her low interest Title IV loan that she previously acquired and which UOP unilaterally paid off; or (c) set up a payment plan with UOP that requires full debt repayment within six months.  UOP further represented that if Ms. Ingram failed to select one of these options, or otherwise immediately pay off the debt in full, her account would be turned over to collections, which would adversely affect her credit.  Subsequently, UOP did turn over her account to a debt

collector.

13.     Plaintiff Shawn Martin:

a.     Mr. Martin is a resident of Pulaski County, Arkansas and attended the Little Rock campus of The University of Phoenix. Mr. Martin enrolled in the Criminal Justice program on or about July 30, 2008. He attended orientation on August 21, 2008 and began classes on August 26, 2008. Mr. Martin terminated his enrollment on October 15, 2008.

b.     Mr. Martin applied, qualified and received a federal loan to pay for his UOP education. Concurrent with enrollment, Mr. Martin contracted with Citibank for approximately $6,000, a loan authorized under the Title IV program. Mr. Martin's Student Financial Aid Agreement designated federal financial aid as the primary finance option. Mr. Martin did not have the cash, nor would he have attended UOP if he had to pay for it on a cash basis. On October 15, 2008, Mr. Martin withdrew from UOP after attending UOP for approximately eight weeks. According to federal guidelines and UOP policy, UOP was entitled to a pro-rata share of tuition corresponding to the amount of time Mr. Martin attended UOP. Such a sum was to be deducted from Mr. Martin's federal loan that had been paid to UOP. Instead of accepting this payment, however, UOP, without Mr. Martin's consent, improperly returned his federal loan monies, informing him that he would now be responsible for paying any outstanding balance that the return of the loan funds created on his UOP account.

c.     Consistent with Mr. Martin's enrollment documents, he provided payment to UOP in the form of a Title IV loan and satisfied his contractual obligation to pay UOP for the time he attended. By paying off his loan, UOP extinguished his debt for its own purposes. Any

subsequent effort by UOP to collect on the amount which they chose to pay off is not based on any contract, nor does it reflect any obligation that Mr. Martin has undertaken vis-a-vis UOP.

      d.    UOP had no right to interfere with the contract between Mr. Martin and his lender. That UOP chose to extinguish the debt, does not give them the right to collect it directly from Mr. Martin. This not only imposes a requirement where none has been contracted, it is an illegal attempt to convert a Title IV loan owed to a third party lender, with certain rights privileges and obligations into a new and different debt owed directly to the school.

      14.    Plaintiff Angela Russ:

      a.    Ms. Russ is a resident of Los Angeles County, California and attended the West Los Angeles campus of The University of Phoenix. Ms. Russ enrolled in a Bachelor of Science in Business Management class on August 16, 2006 and began classes on or about August 31, 2006. Ms. Russ sought to terminate her enrollment on October 13, 2006 and was officially withdrawn on November 16, 2006.

      b.    Ms. Russ applied, qualified and received a federal loan to pay for her UOP education. On or about August 23, 2006, Ms. Russ contracted with Wells Fargo for loans in excess of $6,000 to pay for tuition related expenses. At least a portion of her loans were authorized under the Title IV program . Ms. Russ' Student Financial Aid Agreement designated federal financial aid as the primary finance option. Ms. Russ did not have the cash, nor would she have attended UOP if she had to pay for it on a cash basis. On November 16, 2006, Ms. Russ withdrew from UOP. According to federal guidelines and UOP policy, UOP was entitled to a pro-rata share of tuition corresponding to the amount of time Ms. Russ attended UOP. Such

a sum was to be deducted from Ms. Russ' federal loan that had been paid to UOP prior to the start of the semester. Instead of accepting this payment, however, UOP, without Ms. Russ' knowledge or consent paid off her student loan in its entirety and instead sought to collect the tuition directly from her.

        c.     Consistent with Ms. Russ' enrollment documents, she provided payment to UOP in the form of a Title IV loan and satisfied her contractual obligation to pay UOP for the time she attended. By paying off her loan, UOP extinguished her debt for its own purposes. UOP's subsequent effort to collect on the amount which they chose to pay off was not based on any contract, nor did it reflect any obligation that Ms. Russ had undertaken vis-a-vis UOP.

        d.     UOP had no right to interfere with the contract between Ms. Russ and her lender. That UOP chose to extinguish the debt, does not give them the right to collect it directly from Ms. Russ. This not only imposes a requirement where none had been contracted, it was an illegal attempt to convert a Title IV loan owed to a third party lender, with certain rights privileges and obligations into a new and different debt owed directly to the school.

     15.     Defendant Apollo Group, Inc., ("Apollo") is an Arizona corporation with its principal place of business at 4615 East Elwood Street, Phoenix, Arizona 85040. Apollo, through its subsidiaries, provides various educational programs and services at high school, college, and graduate levels. The University of Phoenix is its largest and most profitable subsidiary. In 2007, Apollo's consolidated revenues were $2.7 billion, approximately 93% of which was attributable to UOP.

     16.     The University of Phoenix, Inc. ("UOP") offers associates, bachelors, masters,

9

and doctoral degree programs in business, criminal justice, general studies, health administration, and information technology at 79 local campuses and 117 learning centers in 38 states and in the District of Columbia, Puerto Rico, Canada, Mexico and the Netherlands. It also offers its educational programs worldwide through its online educational delivery system.   UOP maintains two campuses in the State of Arkansas, in the cities of Little Rock and Rogers.

### III.   JURISDICTION

17.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which the Plaintiffs are citizens of Arkansas and California and Defendants are citizens of Arizona.

18.   This court has personal jurisdiction over Defendants because they have purposefully availed themselves  of the privilege of conducting business activities within the State of Arkansas  by opening campuses, enrolling students, and facilitating the financial aid process among other systematic and continuous business contacts with the State.

### IV.   VENUE

19.   Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because Defendants are subject to personal jurisdiction in the Eastern District of Arkansas and thus are residents of the Eastern District pursuant to §1391(c), and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the District.

## V.   BACKGROUND

### FEDERAL LOAN PROGRAM

20.     The Higher Education Act ("HEA") of 1965, 20 U.S.C. § 1101, *et seq.*, sought to

make higher education more broadly available by establishing a program of financial aid.  To

remove economic restraints to higher education, the HEA, among other things, established a

federal education loan program.  The basic structure of the federal loan program sought to make

capital available for the financing of education through private sector lenders, rather than the

government.  The program called for private lenders to make educational loans to students at

below-market interest rates, without a credit check or collateral.  To encourage private lenders'

participation in the program, the government subsidized the interest paid on the loans, and

protected the lenders against default by guaranteeing repayment through intermediaries called

guarantee agencies.

21.     The federal loan program quickly became the backbone of the higher education

system, especially for the highly profitable  for-profit sector institutions such as UOP.  In such

schools it is common that the majority of their revenues are derived from federal loan program

monies.  Indeed, UOP in its annual report for 2007 acknowledged that nearly seventy percent of

its revenues were derived from federal loan programs.

22.     As modified and reenacted in 1992, HEA's financial assistance program became

known as the Federal Family Education Loan ("FFEL") Program or the Robert T. Stafford

Federal Student Loan Program (20 USC § 1071(c)).  The FFEL program consists of three

different types of guaranteed student loan programs:  Federal PLUS loans (parents' loans for

undergraduate students) 20 U.S.C. § 1078-2; Federal Consolidation Loans, 20 U.S.C. § 1078-3;

and Stafford Loans, see 20 U.S.C. § 1071(c), 20 U.S.C. § 1077 & 1078.

23.     General benefits of these loans includes deferred interest payments, low monthly

interest rates and  a six month post graduation/withdrawal grace period in which to begin loan

repayment.

24.     In 2000, 43% of all undergraduate students borrowed money through the federal

loan program and the median debt for undergraduate degree recipients at private universities was

$17,250.  Of those students who pursue a professional degree, 87% had borrowed through the

federal loan program, and the median debt of professional degree recipients at private universities

was $73,533 and $61,417 at public universities.  In the last decade, federal loans have increased

by 89%.

### PARTICIPATION IN THE FEDERAL LOAN PROGRAM

25. The majority of for-profit post-secondary institutions such as UOP rely heavily on

federal loan money to operate.  Indeed, in 2007, approximately 69% of UOP's revenues were

derived  from federal loan money.

26.     Given the value of the federal loan program to both students and institutions, and

the potential for abuse, the government implemented a series of requirements that institutions

must meet in order maintain the right to participate in the loan program.  Foremost among

requirements is the obligation to maintain cohort default rates within certain thresholds.

27.     According to the Cohort Default Rate Guide ("Guide") published by the U.S.

government, a cohort default rate is the percentage of a school's borrowers who enter repayment

12

on federal loans during that fiscal year and default within the cohort default period.  The formula

the Department of Education uses for calculating a school's cohort default rate depends on the

number of borrowers from that school entering repayment in particular cohort fiscal year and the

number of cohort default rates previously calculated for the school.

28.      According the Guide, cohort default rates are important because defaulted federal

student loans cost taxpayers money. Accordingly, cohort default rate sanctions and benefits

provide an incentive to schools to work with their borrowers to reduce default. Sanctions also can

prevent a school with a high percentage of defaulters from continuing to participate in the federal

loan program.

29.      The Department of Education has set the following cohort default thresholds:

a.       A school whose most  recent official cohort default rate is less than 5.0

percent and is an eligible home institution that is certifying or originating loans to cover the cost

of attendance in a study abroad program may deliver or disburse loan proceeds in a single

installment to a student studying abroad regardless of the length of the student's loan period.  The

school may also choose not to delay the delivery or disbursement of the first installment of loan

proceeds for first-year first-time borrowers studying abroad.

b.       A school with a cohort default rate of less than 10.0 percent for each of the

three most recent fiscal years for which data are available, including eligible home institutions

and foreign institutions, may deliver or disburse, in a single installment, loans that are made for

one semester, one trimester, one quarter, or a four-month period.  The school may also choose

not to delay the first disbursement of a loan  for 30 days for first-time, first-year undergraduate

borrowers.

        c.      A school whose three most recent official cohort default rates are 25.0 percent or greater, except in the event of a successful adjustment or appeal, will lose loan and grant program eligibility for the remainder of the fiscal year in which the school is notified of its sanction and for the following two fiscal years.

        d.      A school whose current official cohort default rate is greater than 40.0 percent, except in the event of a successful adjustment or appeal,  will lose loan program eligibility for the remainder of the fiscal year in which the school is notified of its sanction and for the following two fiscal years.

        30.      UOP recognized and repeated these standards in their most recent annual report filed with the Securities and Exchange Commission on Form 10-K. UOP specifically noted that if UOP cohort default rates exceed 10%, it will have a materially adverse effect on its business. UOP's Form 10-K included the following statements pertaining to its dependence upon federal loans in its operations:

        a.      "Student Loan Defaults. To remain eligible to participate in Title IV programs, educational institutions must maintain a student loan cohort default rate below 25% for three consecutive years and below 40% for any given year. In addition, if its student loan default rate equals or exceeds 10%, the educational institution must delay for 30 days the release of federal student loan proceeds for first time borrowers and permanently loses the ability to participate in the "school-as-lender" program as part of the Stafford Loan program, among other penalties.... UOP cohort default rates for the federal student loan programs for 2005 as reported

by the U.S. Department of Education were 7.3%..... [W]e have implemented initiatives to mitigate the greater risk of student loan defaults." Form 10-K at p. 22.

      b.    "If we lose our eligibility to participate in Title IV programs because of high student loan default rates, it would have a material adverse effect on our business. In addition, if its student loan default rate equals or exceeds 10%, the educational institution is required to delay for 30 days the release of federal student loan proceeds for first time borrowers and permanently loses the ability to participate in the "school-as-lender" program, among other penalties. If [UOP's] student loan cohort default rate exceeds 10%, the limitations on our business could have a material adverse impact."  Form 10-K at p. 27.

## VI.   GENERAL ALLEGATIONS

31.    When UOP unilaterally repaid students' loans, it improperly denied students the use of federal funds that they had earned and to which they were entitled, under 34 CFR §688.22, to pay for their educational expenses.

32.    The UOP application process requires the following: (1) UOP Financial Aid Application; (2) Free Application for Federal Student Aid (FASFA); (3) Federal Stafford Loan Master Promissory Note; (4) Entrance Interview Form; and (5) UOP Student Finance Agreement. None of these documents provide UOP the right to pay off student loans covering the education costs that have already accrued.  Quite to the contrary, the documents provide a detailed breakdown of just how funds will be drawn down upon withdrawal.

33.    The UOP school catalog specifically states only that, "the University follows the Federal Return of Title IV funds regulations. Under the provisions, when a recipient of Federal

Student Aid (FSA) funds withdraws from the University during a payment period, the University must determine the amount of FSA funds earned as of the student's withdrawal date. If the total amount of funds earned is less than the amount disbursed, funds will be returned to the appropriate FSA Programs. If the total amount of FSA funds earned is greater than the total amount of funds disbursed, the difference between these amounts may be treated as a post-withdrawal disbursement.

34.     Similarly, the UOP Consumer Information Guide, which provides consumer information to all students and is required for all schools participating in the federal financial aid program, states the following with respect to the return of Title IV loans:

"If a student withdraws before completing more than 60% of the payment period, the percentage of FSA funds earned will equal the percentage of the calendar days completed in the payment period prior up to the withdrawal date. After the 60% point in the payment period, a student has earned 100% of the FSA funds he or she was scheduled to receive during the period."

35.     The school's institutional refund policy is consistent:

Students who have completed 60% or less of the course of instruction are eligible for a pro rata refund. The refund will be the amount the student paid for the instruction multiplied by a fraction, the numerator of which is the number of hours (weeks ) of instruction which the student has not received, but for which the student has paid, and the denominator of which is the total number of hours (weeks ) instruction for which the student has paid.

36.     Ultimately, none of the documents provided by UOP to its students provide the school the

16

right to unilaterally return the federal loan monies to the lenders for accrued tuition charges and then seek

that amount directly from the student. Doing so denies students the use of federal funds to which they

were entitled. UOP's subsequent effort to collect debt which it had extinguished by paying off the loan,

not only attempts to unilaterally create new debt, it does so on terms far more onerous that those provided

by the federal loan. For example, once UOP pays off the federal loan, they demanded immediate and full

payment from the student. In stark contrast, under Title IV, a student has a six month grace period before

a loan payment comes due. Moreover, even after the six month period, it may take up to 60 days before

the lender schedules the first payment, then 270 days of delinquency on the loan by the borrower and after

that an average of 90 days for a default claim to be filed. 34 CFR §§682.200(b), 682.209(a)(2) and (3).

37.     The agreement to repay a federal loan (the promissory note) is an agreement between the

borrower and the lender. Therefore, the decision to cancel a loan is for the student to make, not UOP.

Unless the school determines that its certification of the student's eligibility is incorrect (which requires a

return of Title IV money under 34 CFR 668.22), it does not have standing to cancel the loan. Only the

student or the lender can cancel the loan because they are the only parties to the contract. Since the

students were eligible for the Title IV money they received, and neither the plaintiffs, putative class

members, nor lenders cancelled the agreements, UOP's improper return of the students' federal loan

monies - money which was allotted for the payment of the students' tuition debt - represents an unlawful

exercise of dominion and control of these funds and cannot result in the students owing a new balance to

the school. Whatever federal loan money UOP took from the students' accounts that was applicable to

their accrued tuition, is money that should be used to cancel any so-called debt that UOP claims is owed

by the students to UOP. UOP's improper repayments must be considered payment in full of the students'

17

debt to the school, not merely a cancellation of the loans. Moreover, any attempt to obtain further payment directly from the students is warrantless and unlawful.

## VIII.   CLASS ACTION ALLEGATIONS

38.     Plaintiffs bring this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated, with the Class being defined as follows:

> All UOP students who, in the last four years, received Title IV loans to pay for
>
> tuition expenses accrued at UOP, whose Title IV loan monies for the accrued
>
> tuition charges were paid back to the lender by UOP subsequent to the student's
>
> withdrawal from UOP; and who were then made liable for an equivalent or
>
> portion of that  sum by UOP.

39.     The members of the Class are so numerous that joinder of all members would be impracticable. The precise number of Class Members and their addresses are unknown to Plaintiffs, but each Class Member should be readily identifiable from information and records in Defendants' possession or control.   Plaintiffs reasonably estimate that there are thousands of borrowers at issue.

40.     There are questions of law and fact common to the members of the Class that predominate over any questions affecting only individual members, including, but not limited to:

       a.     Whether Defendants wrongfully interfered with rights of Plaintiffs and class members by returning their federal loan funds and then seeking remuneration directly from

18

the student;

        b.      Whether Defendants breached their contract with Plaintiffs and Class Members;

        c.      Whether, as a result of Defendants' conduct, Plaintiffs and the Class are entitled to damages, restitution, injunctive, equitable, and other relief, and the amount and nature of such relief.

41.      The claims of Plaintiffs are typical of the claims of the members of the Class. Plaintiffs have no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiffs.

42.      Plaintiffs will fairly and adequately protect the interests of the Class, and have retained attorneys experienced in class and complex litigation.

43.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy for the following reasons:

        (a)      It is economically impractical for members of the Class to prosecute individual actions;

        (b)      The Class is readily definable; and

        (c)      Prosecution as a class action will eliminate the possibility of repetitious litigation.

44.      A class action will cause an orderly and expeditious administration of the claims of the Class.  Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.  Absent a  class action, Class members will continue to suffer losses,

Defendants' violations of law will be allowed to proceed without remedy  and Defendants will retain sums received as a result of its wrongdoing.

45.     The prosecution of separate claims by individual class members would create a risk of inconsistent or varying adjudications with respect to thousands of individual class members, which would, as a practical matter, dispose of the interests of the class members not parties to those separate actions or would substantially impair or impede their ability to protect their interests and enforce their rights.

46.     Plaintiff does not anticipate any difficulty in the management of this litigation as a class action.

## FIRST CAUSE OF ACTION

### Conversion

47.     Plaintiffs incorporate by reference and reallage all paragraphs previously alleged herein.  These claims are brought on behalf of Plaintiffs and the Class against the Defendants.

48.     Plaintiffs and each member of the class had a legal right to the use and possession of their Title IV funds at the time of the conversion.

49.     UOP intentionally asserted control over Plaintiffs' and each Class Member's Title IV funds -  interfering with Plaintiffs' and each Class Members' legal right to the funds and using the funds in a manner for which UOP was not authorized.

50.     UOP asserted control over Plaintiffs' and each class member's Title IV funds in order to manipulate UOP's cohort default rates and mislead the United States government as to the percentage of UOP students who default on their student loans, demonstrating that UOP's

20

action was in bad faith.

51.     By intentionally returning the Title IV funds to which Plaintiffs and the class members were legally entitled, UOP seriously, completely, and permanently interfered with Plaintiffs' and the class members' right to their Title IV funds.

52.     Adding insult to injury, after having wrongly taken the Title IV funds from Plaintiffs and the class members, UOP billed Plaintiffs and the class members for the amount of the Title IV funds that UOP had taken from them - demanding immediate payment and threatening that non-payment would be sent to collections and reported to credit agencies as bad debt.

53.     Plaintiffs request that UOP reimburse Plaintiffs and the class members in full for the Title IV funds that were wrongly taken from Plaintiffs and the class members, for compensatory damages and punitive damages.

**SECOND CAUSE OF ACTION**

**Breach of Contract**

54.     Plaintiffs incorporate by reference and reallage all paragraphs previously alleged herein. These claims are brought on behalf of Plaintiffs and the Class against the Defendants.

55.     Plaintiffs and each member of the class signed enrollment agreements which were valid and enforceable contracts between UOP and Plaintiffs and UOP and class members.

56.     The enrollment agreements obligated the Plaintiffs and the class members to pay UOP tuition.

57.     A material term, incorporated into the enrollment agreements, was that eligible

Plaintiffs' and class members' tuition would be paid by Title IV loans. Plaintiffs' and the class members' contract performance was thus contingent upon being eligible for and receiving Title IV loan money to be used to pay their tuition to UOP.

58.     Plaintiffs and each member of the class applied for, were eligible for, and did receive Title IV money which they authorized to be used for the payment of their tuition to UOP. In so doing, Plaintiffs and each class member met their contract obligations to UOP.

59.     Incorporated into the enrollment agreements was the understanding that UOP would credit the Title IV loan money toward the payment of Plaintiffs' and the class members' tuition.

60.     Yet, subsequent to their withdrawing from school, UOP unilaterally, without the knowledge or consent of Plaintiffs and the class members, improperly paid off their federal loans, breaching their contracts with Plaintiffs and each member of the class.

61.     UOP, after having received payment for the tuition as contemplated by the terms of the contract and after having wrongly returned that money, then proceeded to wrongly bill Plaintiffs and the class members for an equivalent sum of money.

62.     Nothing in the contract between the student and the lender nor the student and UOP allows UOP to unilaterally pay off student loans under these conditions nor to create a new debt.

63.     Plaintiffs and the class members performed their contractual obligations and should not be required to reimburse UOP for the student loan money that UOP wrongly returned to the lenders for its own nefarious purposes.

22

## THIRD CAUSE OF ACTION

### Interference With Contractual Relations

64.     Plaintiffs incorporate by reference and reallage all paragraphs previously alleged

herein.  These claims are brought on behalf of the Plaintiffs and class against the Defendants.

65.     Plaintiffs and class members each had a valid contractual relationship with UOP

as evidenced in part by their enrollment and financial aid agreements.

66.     By virtue of the financial aid applications and student financial agreements

completed by Plaintiffs and class members designating their intention to  pay for tuition with

federal loans, UOP was aware that Plaintiffs and the class contracted with third-party lenders to

secure such loans.

67.     By returning to the third party lender the federal loan monies for which the

students were entitled, UOP effectively terminated the relationship between the student borrower

and the third party lender.  UOP was not a party to the contract and had no standing to terminate

or otherwise interfere with the relationship.

68.     By subsequently seeking tuition directly from the student, rather than having

debited the federal loan which was expressly earmarked to pay for tuition, UOP disrupted the

relationship between the student borrower and the third party lender.  By subsequently attempting

to make students liable for amounts which could have been paid through federal loans, UOP

caused damage to students.  Students were forced to pay sums which they did not owe to UOP.

Students that did not pay were reported to collection companies and credit bureaus as delinquent.

23

69.     Defendants' conduct was improper.

## FOURTH CAUSE OF ACTION

### Breach of the Implied Covenant of Good Faith and Fair Dealing

70.     Plaintiffs incorporate by reference and reallage all paragraphs previously alleged herein.  These claims are brought on behalf of Plaintiffs and the Class against the Defendants.

71.     The contracts entered into between Plaintiff and Defendants, embodied in the Loan Documents, contain an implied covenant of good faith and fair dealing prohibiting Defendants from doing anything that would unfairly interfere with Plaintiffs' right to receive the benefits of the agreement, and from engaging in arbitrary or unfair acts that would unfairly take advantage of Plaintiffs.

72.     UOP's actions unfairly interfered with Plaintiffs' and Class members' rights under their contract with UOP -- specifically by precluding the latter's right to pay for their education through federal loans.

73.     Plaintiffs and Class members did all or substantially all of the significant things that the contracts required that they do.

74.     In engaging in the conduct complained of herein, Defendants unfairly and in bad faith enriched themselves, at the expense of Plaintiffs and Class members, and injured the rights of Plaintiffs and members of the Class to receive the benefits of the agreement.  As a direct and proximate cause of UOP's conduct as alleged herein, Plaintiffs and each member of the Class sustained damages in an amount yet to be determined.

24

## FIFTH CAUSE OF ACTION

### Unjust Enrichment

75.     Plaintiffs incorporate by reference and reallage all paragraphs previously alleged

herein.  These claims are brought on behalf of the Plaintiffs and class against the Defendants.


76.     Defendants have received, and continue to receive, benefits at the expense of

Plaintiffs and class members and it would be unjust for Defendants to retain these benefits.

Defendants have knowledge of these benefits.

77.     As a direct and proximate result of Defendants' unlawful acts and practices,

Plaintiffs and class members are subject to Defendants' payment demands and/or debt collection

efforts, and are therefore entitled to restoration of their legal rights and obligations as they were

promised in their enrollment documents.

### PRAYER FOR RELIEF

Wherefore, Plaintiffs, on behalf of themselves and all others similarly situated, pray for

judgment against Defendants as follows:

1.     Actual damages suffered by Plaintiffs and the Class in an amount according to proof

at trial;

2.     Restitution, including reimbursement to the Plaintiffs and all Class Members of all

monies paid to UOP by or on behalf of the students after their Title IV loans had been returned to

the third party lenders and their debt extinguished;

3.     A permanent injunction:

    (A)   enjoining Defendants from continuing this practice;

    (B)   requiring UOP to rescind all collection agency referrals for affected students;

    (C)   directing collection agencies to retract any negative reports made to credit agencies concerning affected students;

4.     An award of punitive damages;

5.     An award of reasonable attorneys' fees and costs;

6.     Statutory pre-judgment and post-judgment interest; and

7.     All other relief that this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs and the class demand a jury trial in this action for all the claims so triable.

Respectfully submitted,

Richard A. Adams
Arkansas Bar No.  97036
Phillip N. Cockrell
Arkansas Bar No.  79154
Corey D. McGaha
Arkansas Bar No.  2003047
**PATTON ROBERTS PLLC**
Century Bank Plaza, Suite 400
P.O. Box 6128
Texarkana, Texas 75505-6128
Phone:  (903) 334-7000
Fax:  (903) 334-7007

Jeremy Y. Hutchinson
Arkansas Bar No. 2006145
**PATTON ROBERTS PLLC**
111 Center St., Suite 1315
Little Rock, AR 72201
Telephone: (501) 372-3480
Facsimile: (501) 372-3488

Janet Lindner Spielberg
Cal. Bar No. 221926
**LAW OFFICE OF JANET
LINDNER SPIELBERG**
12400 Wilshire Blvd., Ste. 400
Los Angeles, CA 90025
Telephone (310) 392-8801
Facsimile: (310) 278-5938

Michael D. Braun
Cal. Bar No. 167416
**BRAUN LAW GROUP, P.C.**
12304 Santa Monica Blvd., Ste. 109
Los Angeles, CA 90025
Telephone: (310) 442-7755
Facsimile: (310) 442-7756

**ATTORNEYS FOR PLAINTIFFS**